*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CHRISTOPHER RAY WEISSERT,

        Defendant-Appellant.

UNPUBLISHED
June 22, 2023

No. 359644
Genesee Circuit Court
LC No. 18-042955-FC

Before: RIORDAN, P.J., and BORRELLO and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) (victim under 13), and second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a) (victim under 13). The trial court sentenced defendant to 300 to 450 months' imprisonment for the CSC-I conviction and 10 to 15 years' imprisonment for the CSC-II conviction. We affirm.

## I. BACKGROUND

### A. FACTS REGARDING ASSAULT OF CS

This case arises from the sexual assault of CS, which occurred in July 2017. CS was six years old at the time. Defendant was 44 years old in July 2017 and was married to Kimberly Weissert, the sister of CS's mother, Amanda.[1]

---

[1] Because there are many family members who share a common last name, and in an effort to protect the identity of the child victim in this case, we will refer to some witnesses by their first names.

CS would often go over to Kimberly and defendant's home and spend the night.[2] There was some dispute regarding when the alleged assault occurred. Defendant and Kimberly both testified that CS last came over to their home on Saturday, July 1, 2017, and spent the night. But Amanda testified that the last visit could have been as late as July 11, 2017.

The criminal incident came to light on July 28, 2017, when Amanda overheard CS talking on the phone with defendant. As was normal, CS had asked to use Amanda's phone to call defendant. Amanda was in the kitchen at the time and handed CS the phone. It was CS's practice to use the speakerphone function on the phone because it was easier for her to understand the person on the other end. CS started talking to defendant, went into her bedroom, and closed the door. Shortly thereafter, Amanda had to use the bathroom. While in the bathroom, which shared a wall with CS's room, Amanda overheard CS saying, "You remember last time I come over and you licked my pee pee."[3] Amanda heard defendant respond, "No." CS repeated, "Remember last time you licked my pee pee. I don't want you—" before defendant interrupted with "no, no" and "I'll talk to you about it when I pick you up," and defendant hung up.

Amanda came out of the bathroom, and CS came out of her bedroom. CS asked her mother what she was doing and told her that she did not need to listen. Amanda explained that she was not intending to eavesdrop, but she nonetheless heard what was said. After the two of them sat on the couch, CS started crying and explained that while Kimberly was sleeping one night, defendant "licked [her] pee pee." CS's biggest concern at the time was getting someone in trouble and not being able to visit defendant and Kimberly's home to see their dog. When asked if defendant touched her in any other way, CS told her mother that "he used his hands to open me."

After processing what CS had just told her, Amanda texted defendant. The messages were admitted into evidence reflect the following exchange:

> *Amanda*: Umm [CS] is pretty upset telling me a big secret you and her have. I don't even know what to say here Chris.
>
> *Defendant*: What you mean
>
> *Amanda*: I heard her talking in her bedroom when I asked her what she said she started bawling telling me about having a secret while Kim is sleeping.
>
> *Defendant*: I'm sorry if I got carried away.tell get in sorry
>
> *Amanda*: Carried away with what exactly

---

[2] CS would also often visit and spend the night at homes of other family members as well.

[3] At first, Amanda thought she was hearing the word "liked," but then when CS repeated the phrase, she heard "licked."

*Defendant*: Hugging and kissing her.  I never hurt her.  I'm sorry if I upset her.  I'm so sorry  [Verbatim message content except for alteration, including any errors.]

While Amanda was engaging in the text exchange with defendant, CS asked her mother, "[I]f you're going to tell him not to do that for me, tell him not to lick my boob, you know?"  CS also mentioned that she was going to say "stop" to defendant, but he covered her mouth.

Amanda then called her husband, Joshua, and told him that he needed to come home immediately.  After Joshua arrived at the house, he spoke with Amanda and CS.  Joshua became very upset, went out to the garage, and called his parents, Susan and David.  After Susan and David arrived at the house, Amanda joined the four of them in the garage.  Susan then went inside to talk to CS.  CS was crying and told Susan that she had gotten defendant in trouble for telling their "secret."  Having no knowledge of what the substance of the allegations were, Susan tried to learn what happened from CS.  During the course of this conversation, Susan started recording with her phone.  A copy of that recording was admitted into evidence and played for the jury.  CS maintained that defendant had "licked" her vagina and sucked and bit on her chest.  CS also told Susan during this conversation that defendant had used duct tape to cover her mouth and that it hurt when it came off.

Amanda and Joshua called the police.  Michigan State Trooper Nicholas Medina was dispatched in response to the call.  Although he talked with Amanda after arriving and saw the text exchange between Amanda and defendant, he purposefully did not speak with CS because it was policy to save those types of interviews for trained, forensic interviewers.  On August 7, 2017, CS was interviewed by Maria Herstein from the Wise Child Advocacy Center.  That interview was recorded, admitted into evidence, and played for the jury.[4]

The day after CS interviewed at Wise, Trooper Medina stopped by defendant's home to talk with him.  Kimberly was not home at the time.  Trooper Medina explained why he was there— to investigate the allegation that defendant sexually assaulted CS—and defendant declined to make a statement.  And when Trooper Medina showed defendant the text exchange between him and Amanda, he said that he did not recall texting.

On August 9, 2017, Kimberly first learned of the allegations against her husband from her sister Melissa.  Kimberly's place of employment was very close to where defendant worked, so she immediately met with him in a nearby parking lot.  Kimberly was furious and stated, among other things, that if she had a gun, she would shoot defendant.  At trial, Melissa testified that Kimberly told her that in response to this statement, defendant said something to the effect, "I wish you would."  Although Kimberly did not recall defendant saying this, she later said that defendant "probably said it."  Defendant, on the other hand, denied ever saying that.

According to defendant, he had already set up a meeting with an attorney and was going to be meeting with him in the early afternoon.  Defendant testified that, at this meeting, his attorney

---

[4] It was defense counsel and defendant, himself, who wanted both the recording of this interview and the recording of CS's discussion with Susan admitted into evidence.

instructed him not to talk to anyone about this, including his wife. At some point that day, Todd Baryo, who is married to Kimberly's sister, Melissa, learned of the allegations. Todd wanted to talk with defendant, so he texted him and set up a meeting at a Menards parking lot. Todd acknowledged that defendant told him that his attorney advised him not to talk about the matter, but Todd nonetheless wanted defendant to look him in the eye and deny doing it, and defendant said he could not do that. Todd testified that he told defendant that in order to not put CS through any more trauma, he needed to turn himself in, and defendant agreed. Defendant added, "I really fucked up this time."[5] Todd testified that the plan was for both he and defendant to go to the police station the following day, but that following morning, defendant called Todd and told him that with no formal charges pending, he would not be going.[6]

CS, who was 10 years old (less than two months away from her 11th birthday) at the time of trial, testified. She explained that the night of the incident, she, defendant, and Kimberly had been hanging out, playing games and watching TV or movies. According to CS, who had been wearing a sleep gown or dress, sometime after Kimberly got up and announced she was going to bed, defendant pulled CS's gown up high enough to expose her chest. Defendant then "nibbled" on CS's chest. CS stated that, while on her back, defendant then licked her vagina, where he did not just lick "the outside" but "went inner a little bit." Defendant then turned CS so she was lying on her stomach and licked her "bottom," which she later acknowledged was her anus. CS said that during this encounter, defendant attempted to keep her from speaking by gently placing his finger across her lips in a "shhhh" manner. CS denied that duct tape was ever used.

Defendant asserted that this incident did not happen and that he did not sexually assault CS in any manner. He maintained that the last time CS came to their house was July 1, 2017. Defendant said that on that day, CS had called, asking to come over, and he picked her up from her house around 5:30 p.m. After then picking up Kimberly and the three of them dining at a restaurant, they got back to defendant's house after 7:00 p.m., where they all changed into pajamas and eventually started to watch a movie. Later in the evening, Kimberly got up, used the restroom, and announced that she was going to bed. Defendant claimed that he told CS it was time for bed as well, but she wanted to finish watching the movie. CS then got a "sheepish grin" on her face, and the two of them engaged in their "game," which defendant called their "hugging and kissing game." CS lifted her hand up, in a playful manner, as if about to strike defendant, then he "hugs onto" her and pretends to gnaw and growl in her ear, then proceeds to kiss her all over her forehead, chin, and nose. Defendant explained that CS was "really squealing and going nuts" during this time. Defendant said that the bedroom door to his and Kimberly's bedroom was open the entire time, and after their "game," he carried CS into the bedroom, where CS normally slept between defendant and Kimberly in bed.

Defendant maintained that when CS called on July 28, 2017, she was asking to come over again, but he had told her "no" because he had to work the following Saturday morning. When

---

[5] Defendant denied saying this or making any other kind of admission to Todd.

[6] Defendant denied that this conversation happened and denied that there was an agreement for Todd to accompany him when turning himself in. But phone records show that defendant did in fact call Todd the morning after their meeting in the Menards parking lot.

confronted with his text exchange with Amanda, defendant said that he had no clue as to what Amanda was referring. He also said that his comment of "sorry if I got carried away" was in relation to their game where he "was kissing all on her face." But just a little later, defendant said that he was apologizing for upsetting CS because he had told her she could not come over that night.

## B. EVIDENCE OF OTHER SEXUAL OFFENSES

Before trial, the prosecution filed a notice of intent that it would be seeking the introduction defendant's other acts involving sexual offenses committed against minors under MCL 768.27a. The prosecutor sought to admit evidence pertaining to defendant's interactions with two members of Kimberly's extended family: a seven-year-old girl, ES,[7] and a 13-year-old girl, CK. The incidents with ES purportedly occurred recently before defendant's alleged assault of CS, but the incident with CK occurred in 1998. At an October 11, 2021 hearing, the trial court ruled that only the evidence with respect to ES was admissible. The trial court found that the incident with CK was too dissimilar, given the age of the purported victim and the fact that it occurred almost 20 years before the charged offense allegedly happened.

At trial, the incidents involving ES were presented through the testimony of ES's stepmother, Rachelle. Rachelle testified that she witnessed peculiar behavior from defendant at a child's birthday party that took place on June 10, 2017, at Todd and Melissa's house. At this party, Rachelle saw defendant playing a game with some young girls, which involved the defendant holding onto the hands of a girl, with the girl climbing up his body before being "flipped" over. While Rachelle had seen this type of game before, this instance looked odd to her because, according to her, while the girls were climbing up defendant's body, "he'd let them go and then they'd go to do it again and he'd miss their feet on his legs and I'd watch his hip and his groin area thrust forward to meet their bodies." Rachelle was disturbed by this behavior and redirected the girls to do something else, effectively ending the game.

At that same party, Rachelle noted that ES wanted to change out of her swimsuit and into her clothes. Rachelle told her to go inside the house and change in the bathroom. A bit later, defendant informed Rachelle that ES had needed help with her swimsuit bottoms and that he had helped her. Rachelle noted that defendant was leaning in, looking directly at her with a smirk on his face. Rachelle thought this was incredibly odd because, being almost eight years old, ES was fully capable of getting dressed and undressed by herself.

Rachelle also testified regarding a different incident that occurred around either Thanksgiving or Christmas of 2016. Rachelle described ES sitting on defendant's lap in a reclining chair. After defendant suggested ES get a blanket so they could "cover up," she saw defendant

---

[7] Although the prosecution's notice of intent to introduce the other-acts evidence described ES as an eight-year-old child, the testimony at trial established that she was seven years old at the time of the alleged other acts.

immediately slide his hands under the blanket.  Thinking this did not look right, Rachelle then told ES that it was time to eat dinner and got her up.

## C.  JURY INSTRUCTIONS AND VERDICT

The trial court instructed the jury on the elements of CSC-I.  The instruction was consistent with how it preliminarily had instructed the jury:

> The Defendant is charged with the crime of first degree criminal sexual conduct.  To prove this charge, the Prosecutor must prove each of the following elements beyond a reasonable doubt; first, that the Defendant engaged in a sexual act that involved touching [CS's] genital opening with the Defendant's mouth or tongue.  If you find that the Defendant is guilty of first degree sexual - criminal sexual conduct, then you must decide whether the Prosecutor has proven each of the following elements beyond a reasonable doubt.  Second issue to decide. Second, that [CS] was less than thirteen-years-old when the offense occurred, and third that the Defendant was seventeen years of age or older when the offense occurred.

Defense counsel affirmatively approved of the instruction.  The jury returned guilty verdicts on both the CSC-I count and the CSC-II count and specifically found that CS was less than 13 years of age and that defendant was at least 17 years of age at the time of the offenses.

## D.  SENTENCING

One of the issues defendant raises on appeal relates to the sentence that he received for his CSC-I conviction.  As background, the initial information in this case was filed on April 19, 2018. With respect to the charged CSC-I count, it provided:

> **COUNT 1: CRIMINAL SEXUAL CONDUCT - FIRST DEGREE (Person Under Thirteen, Defendant 17 years of age or older)**
>
> being 17 years of age or older, did engage in sexual penetration, to-wit: oral-vaginal, with a child under 13 years of age; contrary to MCL 750.520b(1)(a) and MCL 750.520b(2)(b). . . .[8]

---

[8] MCL 750.520b(2)(b) provides:

> Criminal sexual conduct in the first degree is a felony punishable as follows:
>
> * * *
>
> (b) For a violation that is committed by an individual 17 years of age or older against an individual less than 13 years of age by imprisonment for life or any term of years, but not less than 25 years.

FELONY: Life or any term of years; mandatory minimum of 25 years; lifetime electronic monitoring; mandatory AIDS/STD testing; DNA to be taken upon arrest. The Court may impose a consecutive sentence under MCL 750.520b(3).

During the ensuing pretrial hearings, there were references to the mandatory nature of the 25-year minimum sentence.

On September 20, 2021, an amended information was filed. In relation to the CSC-I count, it stated:

**COUNT 1: CRIMINAL SEXUAL CONDUCT - FIRST DEGREE (Person Under 13) - DEFENDANT UNDER 17**

did engage in sexual penetration, to-wit: touching of genital openings with his mouth or tongue with [CS] a child under 13 years of age; contrary to MCL 750.520b(1)(a). . . .

* * *

FELONY: Life or any term of years; mandatory lifetime electronic monitoring; mandatory AIDS/STD testing; DNA to be taken upon arrest. The Court may impose a consecutive sentence under MCL 750.520b(3).

Thus, the charging document now only purported to charge defendant with CSC-I under MCL 750.520b(1)(a) without reference to the 25-year mandatory minimum sentence described in MCL 750.520b(2)(b), and it erroneously modified defendant's alleged status to be "under 17" instead of "at least 17" years old. This was patently wrong because that same document states that defendant's birthdate was June 26, 1973, and that the alleged offense occurred in July 2017. Further, the CSC-II count correctly alleged that defendant was 17 years of age or older at the time of the offense.

In the pretrial conference after this latest filing, the prosecutor put on the record a proposed plea deal, in which defendant would plead guilty to CSC-II in exchange for the prosecutor dismissing the CSC-I count, which the prosecutor conveyed carried a mandatory minimum sentence of at least 25 years. Defendant rejected the offer.

The first time any issue with the amended information was noted on the record was on the first day of trial while the trial court read the information to the jury panel. For the CSC-I count, the trial court noticed that the document said, "Defendant under seventeen." The prosecutor replied that was a mistake and that it should state, "older than seventeen." The trial court then asked defense counsel if he agreed to that change, and he replied "yes." Later that day, while discussing the preliminary jury instructions, the trial court in a discussion with defense counsel reiterated that the amended information was "obviously" incorrect.

At sentencing, defendant objected to the imposition of MCL 750.520b(2)(b)'s mandatory minimum 25-year sentence. Defendant argued that under *Alleyne v United States*, 570 US 99; 133

S Ct 2151; 186 L Ed 2d 314 (2013), and *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), any fact that elevates a defendant's minimum punishment must be put in the charging document and the jury must find that fact beyond a reasonable doubt. Defendant pointed out that because the amended information in this case did not include any reference to the mandatory minimum sentence, it would be a violation of his constitutional rights to impose that mandatory minimum sentence. When the prosecutor mentioned that the jury was instructed to find that the victim was under 13 years old and that defendant was at least 17 years old, defense counsel stressed that his argument was solely based on the lack of notice contained in the amended information. The prosecutor responded that the initial information was correct and that the parties repeatedly discussed during the proceedings that defendant was subject to MCL 750.520b(2)(b)'s mandatory minimum 25-year sentence.

The trial court acknowledged that there clearly were some typographical errors in the amended information. But the trial court ruled that between the original complaint and the other background of this case, defendant was "fully aware" that the prosecution was seeking the enhanced sentencing under MCL 750.520b(2)(b).

Regarding the actual sentence itself, the trial court noted that it could impose a life sentence, but it was imposing a sentence of 300 months (25 years) to 450 months (37.5 years) for the CSC-I conviction and a sentence of 10 to 15 years for the CSC-II conviction. The trial court further noted that even if it were not bound to impose the statutorily required 25-year minimum sentence, it would have imposed the same sentence as a sentence exceeding the guidelines.[9] The trial court found that exceeding the guidelines in this situation was appropriate because defendant was a "predator" and a "danger to the community."

## II. FAILURE TO REOPEN VOIR DIRE

Defendant argues that he is entitled to a new trial because the trial court failed to reopen jury selection after the trial court excused one juror for COVID-related reasons. We disagree that defendant is entitled to any relief.

"To preserve an issue, a party must raise it before the trial court." *People v Swenor*, 336 Mich App 550, 562; 971 NW2d 33 (2021). However, "[a] challenge on one ground before the trial court is not sufficient to preserve a challenge on another ground on appeal." *Id*. In this instance, defendant's argument on appeal is that the trial court erred when it failed to reopen jury selection because it denied him the opportunity to challenge a particular juror who had concerns related to COVID. But in the trial court, although defendant suggested that voir dire be reopened, it was because he wanted to ensure there were *two* alternate jurors; defendant never suggested that he wanted to reopen jury selection to challenge any particular existing juror. In any event, defendant never argued that the failure to reopen jury selection violated MCR 2.511. Accordingly, we conclude that the issue is not preserved. Unpreserved issues are reviewed for plain error affecting substantial rights. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). Under the plain-error rule, "three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v*

---

[9] The trial court determined that the minimum sentencing guidelines range is 51 to 85 months.

*Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). The defendant bears the burden with respect to those elements. *Id*.

On the first day of trial, a 14-member jury was constructed after voir dire was conducted. One of the jurors, juror no. 10, raised the concern of living at home with a parent with an autoimmune deficiency. When asked if he was satisfied with the COVID precautions that the court had taken, the juror responded, "I think so." When pressed if the juror was comfortable to proceed, the juror answered, "I'm not sure." After the trial court asked the parties how they would like to proceed, the prosecutor demurred, and defense counsel stated, "I think if there's an agreement, he can be excused and I wouldn't object." The trial court again wanted to inquire of the juror whether he would be comfortable continuing in a smaller courtroom. But before he could answer, defense counsel requested a bench conference, and after the bench conference, the trial court ruled that the juror was going to continue to serve, noting that if concerns arose in the future, there were two alternates. Notably, the trial court intentionally did not swear the jurors in before dismissing them for the day.[10]

The following morning, the trial court made a record that juror no. 5 had been dismissed because the court learned that the juror, although she had no symptoms herself, nonetheless had close contact with someone who had COVID. The trial court and the parties acknowledged that once a jury composition is changed, caselaw allows parties to challenge any remaining jurors peremptorily or for cause. The trial court, seemingly anticipating that juror no. 10 would not wish to continue, indicated that the plan was to continue with jury selection until 14 members were selected. But before doing so, the trial court wanted to disclose to the jury what had happened and to see if that affected any of the jurors, especially the one who already expressed COVID concerns. None of the jurors expressed an unwillingness to continue. Juror no. 10, however, did ask for details regarding whether the dismissed juror had tested positive or whether she had any symptoms. When informed that there was no positive test and no symptoms, juror no. 10 stated, "I think I'm okay." And when asked if he wanted to stay, he replied, "Yeah." After no juror stated an unwillingness to serve, the trial court changed its approach and stated:

> So, now to our attorneys. Right now we're only down one. You want to continue with the jury that we have or do you want to open the pool back up? I will do whatever you all want to do. Do you want to do this discussion outside the jury's presence or do you want a few minutes? Because we could continue with thirteen but then we only have one person that we can lose. Because once I swear you in, if we go below our twelve, I have to let you all go and we have to start all over from square one. So, right now, because I have not sworn you in yet, we can bring in a separate group and pick up our extra people. So, we're kind of at a really critical point right now. If I had sworn you in yesterday, we would have to continue with the group that we have or call a mistrial and start over.

---

[10] The trial court later explained that the jury had not been sworn in because if they lost more than two people after being sworn in, they would have to start all over from scratch.

The prosecutor expressed a desire to continue with the 13 jurors, i.e., with only one alternate. When asked what defense counsel wanted to do in light of the fact that there was a jury ready to proceed, counsel stated:

> I understand. I just don't want—nobody wants to do this twice. That's the thing. And if we lose I mean, the way things are going it's—

Later, the trial court stated that it was inclined to continue with the jury as is. Defense counsel requested a bench conference, which was granted, and after the jury was excused, defense counsel made a record of why defendant wanted to reopen jury selection:

> He would, your Honor. Just, um, juror number ten's answers even today have been quite equivocal. We're nervous about proceeding, that we might have to do this whole thing over if we lose more than one and it's looking potentially like we could end up going into next week now. There's just so many things that can happen and everybody only wanted to do this once so it would be his preference to reopen jury selection. But I understand if the Court wants to proceed.

In response, the prosecutor pointed out that if they were to start the trial sooner rather than later, i.e., proceed with the current pool, it increased the chances that they would be able to complete the trial that week and not go into the following week, which, with more time passing, the prosecutor implied would increase the odds of something happening to a juror. The trial court agreed with the prosecution and shortly thereafter swore the jury in.

On appeal, defendant argues that the trial court's failure to reopen jury selection was a violation of MCR 2.511(G). As previously indicated, defendant did not raise this argument in the trial court. MCR 2.511(G) provides:

> After the jurors have been seated in the jurors' box and a challenge for cause is sustained or a peremptory challenge or challenges exercised, another juror or other jurors *must* be selected and examined. Such jurors are subject to challenge as are previously seated jurors. [Emphasis added.]

Defendant maintains that the trial court was without discretion and had to fill the vacated juror spot. We agree. The use of the word "must" denotes mandatory action. See *Barrow v Detroit Election Comm*, 301 Mich App 404, 416; 836 NW2d 498 (2013). Although no *party* exercised a challenge for cause for juror no. 5, the trial court stated that it had excused the juror for cause. There is no principled reason to not apply MCR 2.511(G) when the trial court sua

sponte[11] dismisses a juror, instead of a party raising a challenge for cause under MCR 2.511(D).[12] In both instances, the jury pool is being reduced. Therefore, under MCR 2.511(G), once the juror was dismissed, the position was to be replaced with another person. The trial court's failure to do so constitutes clear or obvious error.

Defendant maintains that once an error is found to have occurred, reversal is automatic. We disagree. Defendant relies on *People v Miller*, 411 Mich 321, 326; 307 NW2d 335 (1981), in which our Supreme Court ruled that a defendant was entitled to a new trial because the procedure for jury selection, as prescribed by the then-existing court rules, was not followed. The Court reasoned that requiring a defendant to demonstrate prejudice was "an often impossible burden." *Id*. But in *People v Bell*, 473 Mich 275; 702 NW2d 128 (2005), four justices of the Supreme Court concluded that *Miller* was no longer binding to that extent in light of the state's current harmless-error jurisprudence. *Id*. at 292-294 (opinion by CORRIGAN, J.), citing MCL 769.26, *Carines*, 460 Mich at 774, and *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999); *Bell*, 473 Mich at 302-303 (TAYLOR, C.J., *concurring in part and dissenting in part*), citing MCL 769.26 and MCR 2.613(A).

Defendant maintains that the *Bell* discussion related to *Miller* is dictum and not binding. But "an issue that is intentionally addressed and decided is not dictum if the issue is germane to the controversy in the case, even if the issue was not necessarily decisive of the controversy in the case." *People v Robar*, 321 Mich App 106, 117; 910 NW2d 328 (2017) (quotation marks and citation omitted). There is no question that the justices in *Bell* intentionally addressed the issue and that it was germane to the controversy. The pertinent discussion in *Bell* even had its own subheading labeled "STANDARD OF REVIEW FOR DENIALS OF PREEMPTORY CHALLENGES." *Bell*, 473 Mich at 292.

We further point out that *Miller* is distinguishable from the instant case because in *Miller*, the defense counsel specifically objected to the procedure used in the jury-selection process, thereby preserving the issue. See *Miller*, 411 Mich at 323. As already explained, in the instant case, defendant did not preserve the argument he is making on appeal. While the issue in this case is not constitutional, as in *Miller*, our Supreme Court has made it clear since the issuance of *Miller* that unpreserved nonconstitutional errors are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 774.

Aside from showing that there was plain error, defendant cannot establish the requisite prejudice. An error affects substantial rights if "the error affected the outcome of the lower court

---

[11] It is not entirely clear that the trial court acted of its own volition. When trial convened on the second day, the trial court mentioned, "[W]e made the decision yesterday to excuse juror number five and we will—the attorneys and I have spoken." It is not clear who the "we" is here. It could be court personnel, or it could be the judge and the parties. It also is not clear whose initial idea it was to dismiss the juror. For this analysis, we simply presume that it was the trial court acting sua sponte.

[12] MCR 2.511(D) provides that "[t]he parties may challenge jurors for cause" and that "the court shall rule on each challenge." Therefore, technically, only parties may challenge jurors for cause.

proceedings." *Id*. at 763. Defendant simply cannot show how, had jury selection continued, he would not have been found guilty. Defendant asserts that his rights were affected because juror no. 10 was worried about COVID exposure and therefore was disposed to "rush" through the deliberation process. However, the record does not indicate that defendant would have challenged that juror had jury selection proceeded. At no point did defendant or his counsel express a desire to remove juror no. 10 from the panel. Moreover, defendant's view that the juror was more focused on reaching a verdict quickly rather than seeking a just and fair verdict is based on speculation. For these two reasons, defendant fails to show prejudice.

In summary, defendant's position in the trial court was that he wanted two alternates to help ensure that he did not have to go through a second trial in the event two jurors could not make it through the trial's duration. On appeal, defendant reframes the issue as the court violating MCR 2.511(G), which deprived him of the opportunity to challenge juror no. 10, who previously had expressed some concerns related to COVID. While the trial court committed plain error by not following the requirements of MCR 2.511(G), the plain error did not affect defendant's substantial rights. One alternate was dismissed, and defendant ultimately was tried by a jury of 12 people. Further, there is nothing in the record to show that juror no. 10's presence in the final jury composition somehow introduced any impermissible influences into the deliberations.[13]

### III. ADMISSIBILITY OF PRIOR CONDUCT

Defendant argues that the trial court erred by admitting evidence of his prior behavior with ES because the acts of helping her with her bathing suit and sitting on a recliner with a blanket do not constitute listed offenses under the governing statute. We disagree.

MCL 768.27a(1) provides, in part:

> Notwithstanding [MCL 768.27], in a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant.

The statute defines "listed offense" as it is defined in MCL 28.722 of the Sex Offenders Registration Act, MCL 28.721 *et seq*. MCL 768.27a(2)(a). MCL 28.722(i), in turn, defines "listed offense" as "a tier I, tier II, or tier III offense." MCL 28.722(r), (t), and (v) define what tier I, tier II, and tier III offenses are, respectively. The prosecutor argued that evidence described by Rachelle supported a finding that defendant had committed the offense of CSC-II against a seven-year-old child. MCL 28.722(v)(*v*) specifically includes CSC-II with a victim less than 13 years of

---

[13] We note that even if the issue were preserved, reversal still would not be warranted. The Supreme Court in *Lukity*, 460 Mich at 495, ruled (again, post-*Miller*) that MCL 769.26 controls judicial review of preserved, nonconstitutional error. Under that framework, "a preserved, nonconstitutional error is not a ground for reversal unless 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *Lukity*, 460 Mich at 495-496, quoting MCL 769.26. For the reasons discussed in the plain-error analysis, it is not more probable than not that the error was outcome-determinative.

age as being a "tier III" offense. Accordingly, evidence that shows that defendant committed CSC-II against someone who was less than 13 years of age is admissible under MCL 768.27a.

The question before this Court is whether the evidence introduced through Rachelle's testimony is sufficient to show that defendant committed CSC-II. MCL 750.520c provides, in pertinent part:

> (1) A person is guilty of criminal sexual conduct in the second degree if the person engages in sexual contact with another person and if any of the following circumstances exists:

> (a) That other person is under 13 years of age.

"Sexual contact" is defined as "the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification [or] done for a sexual purpose . . . ." MCL 750.520a(q).

Rachelle described three particular instances involving defendant's interactions with ES: (1) defendant played a game in which the young girls climbed up him and during the course of that game, he would thrust his groin onto the girls' bodies; (2) defendant, with a smirk on his face, informed Rachelle that he had assisted nearly-eight-year-old ES with changing out of her swimsuit bottom; and (3) at an earlier family occasion, after defendant requested a blanket with which to cover him and ES, he immediately slid his hands under the blanket out of sight. On appeal, defendant does not address the first instance, so we decline to address it. But he asserts that the other two instances do not demonstrate sexual contact.

It is important to recognize that proving that a crime occurred can be established through "[c]ircumstantial evidence and reasonable inferences arising from that evidence." *Carines*, 460 Mich at 757 (quotation marks and citation omitted). In this instance, a reasonable fact-finder could infer from Rachelle's testimony that defendant touched ES for a sexually gratifying purpose. Rachelle testified that, for the bathing-suit incident, ES was a month away from turning eight years old and was fully capable of getting dressed and undressed by herself. Therefore, from Rachelle's testimony, there should not have been a reason for defendant to "volunteer" to assist ES with removing her swimsuit bottom.[14] With swimsuit bottoms being at issue, it is reasonable to infer

---

[14] Defendant on appeal asserts that one can assist without physically touching. While as a general principle, that is true, it ignores the situation that Rachelle described. According to her, defendant said that ES needed help with her "bathing suit bottoms," and that he helped her. Rachelle, immediately before this, had instructed ES to go inside the home to change out of her swimsuit and into clothes. The only logical inference from defendant's admission is that defendant assisted ES in getting out of her swimsuit. Contrary to defendant's assertion, this would necessitate some touching in close proximity to ES's groin and buttocks. Defendant provides the example that one could have helped in that situation by handing the child the clothes she was going to change into, but that ignores defendant's statement that he helped ES with her "bathing suit bottoms." One does not help with bathing suit bottoms by handing other items of clothes.

-13-

that it would require some amount of touching on or near ES's groin or buttocks. Given that there was no apparent reason for defendant's assistance, a reasonable inference is that he did this touching for his own sexual gratification, which qualifies as a CSC-II offense. Accordingly, the evidence was admissible under MCL 768.27a.

The blanket situation is less clear. Rachelle testified that at one family gathering near the Thanksgiving or Christmas holiday time, ES was sitting on defendant's lap in a recliner chair when defendant asked ES to get a blanket for them. After ES got the blanket, Rachelle saw defendant immediately put his hands under the blanket out of sight. Rachelle thought this looked very odd and immediately got ES up, telling her that it was time to eat. At the outset, we recognize that the evidence on its face is equivocal: it is entirely possible that defendant was inappropriately touching ES under the blanket, and it also is possible that he did not touch ES at all with his hands. It is noteworthy to us that Rachelle, who was watching this happen in real time, thought it looked odd enough for her to intervene. Although the transcript does not fully describe how defendant or his hands looked when he "slid [them] right under," Rachelle obviously saw this happen. She even apparently mimicked defendant's movement for the jury, as reflected in her testimony, "And as soon as [the blanket arrived,] *he went like this* with the blanket. His hands slid right under. No visibility of them." (Emphasis added.) Although on its face, the evidence was equivocal, that may not have been the case because Rachelle provided more insight into what defendant did with his hands that is not reflected in the transcript. Given that this is a close question, we cannot conclude that the trial court abused its discretion. See *People v Sabin (After Remand)*, 463 Mich 43, 67; 614 NW2d 888 (2000) (stating that a trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion). This is particularly true because defense counsel did not detail for the record Rachelle's hand movements. In any event, it was up to the jury to decide, after listening to and viewing Rachelle during her testimony, if defendant inappropriately touched ES under the blanket.[15] The jury was instructed that it could only consider evidence of these past criminal acts if it first determined that misconduct actually happened.

Defendant also argues that the evidence, even if otherwise admissible under MCL 768.27a, was inadmissible under MRE 403. MRE 403 states, in pertinent part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Ortiz*, 249 Mich App 297, 306; 642 NW2d 417 (2001) (quotation marks and citation omitted).

Defendant's argument appears to be that the evidence had little probative value because it only showed that there was a *possibility* that improper contact had occurred. That misconstrues the probativeness of the evidence. The evidence allowed the jury to infer that defendant had committed CSC-II before, and because he had done so before, it was evidence that he had a propensity to do it this time with CS. Accordingly, the evidence had a high probative value. See

---

[15] We note that MCL 750.520a(q) provides that "sexual contact" also "includes the intentional touching of the . . . actor's intimate parts[.]" Because this is an even closer question, and because the prosecutor does not argue on appeal that defendant committed CSC-II under this aspect of the statute, we will not address that issue.

*People v Watkins*, 491 Mich 450, 470; 818 NW2d 296 (2012) ("[A] defendant's character and propensity to commit the charged offense is highly relevant . . . ."). Defendant also avers that the evidence was not admissible because it was "highly damaging." In particular, defendant claims that the evidence "allowed the prosecutor to use the implication of propensity to ridicule the defense's argument that CS was being untruthful." To the extent defendant is arguing that using the evidence as propensity evidence is unfair, that argument has already been rejected by our Supreme Court in *Watkins*. When evaluating evidence being introduced through MCL 768.27a, any propensity inference for MRE 403 purposes is to be viewed *in favor* of the evidence's probative value, rather than its prejudicial effect. *Id*. at 487. Therefore, defendant's argument pertaining to MRE 403 is not persuasive.

Accordingly, we hold that the trial court did not abuse its discretion by admitting evidence of defendant's past conduct through the testimony of Rachelle.

### IV. MOTION FOR MISTRIAL

Defendant argues that the trial court erred when it failed to grant his request for a mistrial after the prosecutor asked defendant's wife if she had ever attempted to cover up a prior sexual assault committed by him. We disagree. This Court reviews a trial court's decision on a motion for a mistrial for an abuse of discretion. *People v Alter*, 255 Mich App 194, 205; 659 NW2d 667 (2003). "A trial court abuses its discretion when it fails to select a principled outcome." *People v Horn*, 279 Mich App 31, 35 n 1; 755 NW2d 212 (2008).

As previously described, when the prosecutor sought to admit into evidence, under MCL 768.27a, some prior acts of defendant involving young girls who were relatives of Kimberly, the trial court allowed evidence related to ES but not CK. The crux of the allegation regarding CK is that, in 1998, while CK was home alone, defendant stopped by, and in the kitchen, "pressed up against her," "pinned her between himself and the kitchen counter," leaned in, and whispered, "Do you want to go upstairs?" It was further alleged that, after CK reported the incident to her parents, Kimberly initially was very upset about the allegation, but after defendant proposed to Kimberly, "everyone forgot what [CK] had told them." According to CK, Kimberly suggested that CK was jealous of Kimberly and her relationship with defendant.

At trial, during the prosecution's redirect examination of Kimberly, the prosecutor asked, "Now this isn't the first time that you've tried to help [defendant] cover up a time when he's been accused of sexually assaulting another person, correct?"[16] This immediately drew an objection from defense counsel, and after the trial court excused the jury, the parties discussed the matter.

The prosecutor contended that the question was permissible as a means to impeach Kimberly's credibility, specifically by demonstrating her bias in the matter. While arguing that

---

[16] Notably, no response from Kimberly is reflected in the transcript, but later when the trial court was summarizing what had happened, it stated that Kimberly said "no" before the objection was raised.

the question was inappropriate and that any answer was inadmissible, defense counsel requested a mistrial, stating:

> At this point our jury heard that there was an accusation that [Kimberly] covered up her husband potentially sexually assaulting [CK]. They heard the name [CK]. It was loud enough for the jury to hear at the bench. We have no choice at this point but to—I don't think a limining [sic] instruction can fix. They've dirtied him up to the point where we can't safely go forward and we're requesting a mistrial.

The trial court ultimately ruled that the evidence was inadmissible under MRE 608(b). The trial court denied the request for a mistrial, simply stating that one was not "necessary." The trial court also disagreed with defense counsel's position that the name of the alleged victim was heard by the jury during this discussion. While her name was mentioned in the bench conference before the jury was excused, the trial court found that the jury could not have heard it. The trial court provided the following curative instruction to the jury:

> And so, the last question that [the prosecutor] asked about whether or not there had been some kind of an allegation regarding another assault. You are to disregard that question and anything you may have heard or overheard in that regard. It's been deemed excluded and you're not to concern yourself with the reasons why. That is not something for you to consider.

"[A] prosecutor's good-faith effort to admit evidence does not constitute misconduct." *People v Dobek*, 274 Mich App 58, 72; 732 NW2d 546 (2007). Although the prosecutor was inquiring into *Kimberly's* actions surrounding CK's allegations against defendant, the trial court previously had ruled that defendant's alleged interaction with CK in 1998 was inadmissible. The prosecutor recognized that evidence of defendant's interactions was inadmissible under the trial court's prior ruling, but he maintained that it is not uncommon for evidence to be admissible for one purpose and not another. That undoubtedly is a correct view of the law. See *People v VanderVliet*, 444 Mich 52, 73; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994). As such, we conclude that the prosecutor's asking the question does not constitute prosecutorial misconduct because there was a good-faith effort, grounded in existing law, to admit evidence of Kimberly's actions.

We further conclude that the trial court did not abuse its discretion by denying defendant's motion for mistrial. "A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial." *Alter*, 255 Mich App at 205 (cleaned up).

The question arguably left the jury with the impression that not only had defendant sexually assaulted someone before, but also that his wife had taken steps to cover up for him. But jurors are presumed to follow their instructions, and instructions are sufficient to cure most prejudice. *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020). The curative instruction given in this case presumably cured any prejudice, which preserved defendant's right to a fair trial. Moreover, the question was brief and did not include any details about the alleged prior sexual assault, so to the extent that the jury did not follow its instructions, it easily may have inferred that the question was about the multiple other alleged sexual assaults openly discussed at trial.

Critically, this issue is not reviewed de novo, but is instead reviewed under the abuse-of-discretion standard, which contemplates that there can be more than a single correct outcome. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003); *People v Smith*, 282 Mich App 191, 194; 772 NW2d 428 (2009). We cannot conclude that the trial court made an unprincipled decision to deny the motion for a mistrial and to instead provide a curative instruction.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied the right to the effective assistance of counsel when his counsel agreed to jury instructions that did not correctly list the necessary elements for CSC-I. Although the instructions were imperfect, defendant is not entitled to any relief.

Generally, claims of ineffective assistance of counsel involve a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews a trial court's factual findings for clear error, and any constitutional determinations are reviewed de novo. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). However, when no evidentiary hearing is held, this Court's review "is limited to mistakes apparent on the record." *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

The trial court instructed the jury on the elements of CSC-I. The final instruction was consistent with how it preliminary had instructed the jury:

> The Defendant is charged with the crime of first degree criminal sexual conduct. To prove this charge, the Prosecutor must prove each of the following elements beyond a reasonable doubt; first, that the Defendant engaged in a sexual act that involved touching [CS's] genital opening with the Defendant's mouth or tongue. If you find that the Defendant is guilty of first degree sexual - criminal sexual conduct, then you must decide whether the Prosecutor has proven each of the following elements beyond a reasonable doubt. Second issue to decide. Second, that [CS] was less than thirteen-years-old when the offense occurred, and third that the Defendant was seventeen years of age or older when the offense occurred.

Defense counsel affirmatively approved of the instruction.

Defendants have the constitutional right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Aceval*, 282 Mich App 379, 386; 764 NW2d 285 (2009). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *LeBlanc*, 465 Mich at 578. Generally, to establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

"A trial judge must instruct the jury as to the applicable law, and fully and fairly present the case to the jury in an understandable manner." *People v Waclawski*, 286 Mich App 634, 676; 780 NW2d 321 (2009). Further, jury instructions are to include all the elements of the charged offenses. *Dobek*, 274 Mich App at 82. However, "[e]ven if somewhat imperfect, instructions do

not create error if they fairly presented the issues for trial and sufficiently protected the defendant's rights." *People v Canales*, 243 Mich App 571, 574; 624 NW2d 439 (2000).

"To prove [CSC-I] under MCL 750.520b(1)(a), the prosecution was required to show that defendant engaged in sexual penetration with another person under the age of thirteen." *Waclawski*, 286 Mich App at 676. Additionally, to prove the applicability of MCL 750.520b(2)(b), which provides for a 25-year mandatory minimum sentence, the prosecutor was required to show that CS was under the age of 13 and that defendant was 17 years of age or older at the time of the offense.

The instruction on CSC-I in this case asked the jury to make three determinations: (1) that defendant "engaged in a sexual act that involved touching [CS's] genital opening with the Defendant's mouth or tongue," (2) that CS was less than 13 years old at the time, and (3) that defendant was at least 17 years of age at the time. Accordingly, the jury essentially was instructed that it had to find all of the requisite elements of both MCL 750.520b(1)(a) and MCL 750.520b(2)(b).[17]

Defendant nevertheless takes issue with the trial court's injection of the following language after the recitation of the first element listed above: "If you find that the Defendant *is guilty* of first degree sexual—criminal sexual conduct, *then* you must decide [whether the second and third elements are established]" (emphasis added). Defendant argues that this suggested to the jury that it could find defendant guilty of CSC-I without finding that CS was under the age of 13, which is a requisite element for a conviction under MCL 750.520b(1)(a). Defendant agrees that the jury was ultimately instructed to find that CS was under the age of 13, but argues that the instruction on this point was improperly presented solely in connection with the "penalty portion" of the offense, i.e., the 25-year mandatory minimum under MCL 750.520b(2)(b), rather than as a required element of the primary offense of CSC-I under MCL 750.520b(1)(a).

We note that this error apparently arose from the amalgamation of two jury instructions, M Crim JI 20.1 (pertaining to a charge of CSC-I under MCL 750.520b(1)) and M Crim JI 20.30b (pertaining to the additional elements of MCL 750.520b(2)(b)), as well as the omission of M Crim JI 20.3 (pertaining specifically to a charge of CSC-I under subdivision (a) of MCL 750.520b(1)). M Crim JI 20.1 contains four components (bolded emphasis added):

> (1) The defendant is charged with the crime of first-degree criminal sexual conduct. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt:
>
> (2) First, that the defendant engaged in a sexual act that involved
>
> [*Choose (a), (b), (c), or (d)*:]

---

[17] Defendant acknowledges in his brief on appeal that the jury instructions were sufficient to require a finding of sexual penetration.

* * *

(c) touching of [(*name complainant*) / the defendant]'s [genital openings / genital organs] with [(*name complainant*) / the defendant]'s mouth or tongue.

* * *

**(3) [*Follow this instruction with one or more of the nine alternatives, M Crim JI 20.3 to M Crim JI 20.11, as warranted by the evidence.*]**

(4) [*Where the defendant is charged under MCL 750.520b(2)(b) with the 25-year mandatory minimum for being 17 years of age or older and penetrating a child under 13 years old, instruct according to M Crim JI 20.30b.*]

The trial court's instruction captured components (1), (2), and (4), but omitted (3). For this third component, the trial court was to provide an instruction on which circumstance existed along with the sexual penetration to support a CSC-I conviction.[18] In this instance, the underlying allegation for the charge of CSC-I was that CS was under the age of 13 at the time of the offense. That corresponds to M Crim JI 20.3, which states, "[Second/Third], that [*name complainant*] was less than thirteen years old at the time of the alleged act." Thus, a proper instruction would look like the following:

The defendant is charged with the crime of first-degree criminal sexual conduct. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt:

First, that the defendant engaged in a sexual act that involved touching of [CS's] genital opening with the defendant's mouth or tongue.

Second, that [CS] was less than thirteen years old at the time of the alleged act.

Then, because the prosecution was seeking the enhanced 25-year mandatory minimum sentence under MCL 750.520b(2)(b), M Crim JI 20.1 instructs that M Crim JI 20.30b is to be given, which provides:

(1) If you find that the defendant is guilty of first-degree criminal sexual conduct, then you must decide whether the prosecutor has proved each of the following elements beyond a reasonable doubt:

---

[18] MCL 750.520b(1) provides that a person is guilty of CSC-I if she or he engages in sexual penetration with another person *and* any of the enumerated circumstances listed under subsections (1)(a) through (1)(h) exist. MCL 750.520b(1)(a) addresses the pertinent circumstance in this case: "[t]hat other person is under 13 years of age."

-19-

(2) First, that [*name complainant*] was less than thirteen years old when the offense occurred, and,

(3) Second, that the defendant was seventeen years of age or older when the offense occurred.

The latter portion of the trial court's instruction corresponds to this instruction, with the exception that the trial court changed the word "first" to be "second" and the word "second" to be "third." The parties and the trial court earlier realized that something was not quite correct with the instructions and decided that changing these ordinal labels helped because then there would not be two "firsts" when all read together. Defense counsel was "happy" with that revision.

As already mentioned, the provided instruction could give the impression that only a sexual act that involved touching CS's genital opening with defendant's mouth or tongue was needed to find that defendant committed CSC-I. It was not reasonable for counsel to agree with instructions that potentially omitted a key element, i.e., that the prosecutor had to also prove that CS was less than 13 years old for defendant to be guilty of CSC-I.

But defendant simply cannot establish any prejudice resulting from the instruction. See *People v Duncan*, 462 Mich 47, 54; 610 NW2d 551 (2000) (explaining that "an instructional error regarding one element of a crime, whether by misdescription or omission, is subject to a harmless error analysis"). Vitally, in the verdict form, the jury was expressly asked whether CS was under the age of 13 and whether defendant was 17 years of age or older at the time of the offense. Although this question was posed for sentencing purposes under MCL 750.520(2)(b), the jury was unaware of its purpose, and the jury answered in the affirmative. With the jury making the explicit finding that CS was less than 13 years of age at the time of the offense, it strains credulity to suggest that there was a reasonable likelihood that the outcome of the proceeding would have been different had counsel not approved the imperfect jury instruction and had a more accurate one been provided.

## VI. EFFECT OF CUMULATIVE ERRORS

Defendant argues that the prejudicial effect of the cumulative errors from the previous issues in this appeal requires reversal. We disagree. Unpreserved issues are reviewed for plain error affecting substantial rights. *Chelmicki*, 305 Mich App at 62.

"The cumulative effect of several minor errors may warrant reversal even where individual errors in the case would not warrant reversal." *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001). To reverse on the basis of cumulative error, the errors "must be of consequence." *Id*. Consequently, "the effect of the errors must have been seriously prejudicial in order to warrant a finding that defendant was denied a fair trial." *Id*.

The only potential errors we have identified involve the trial court's failure to replace juror no. 5, the prosecutor asking Kimberly if she had helped cover up a past sexual assault by defendant, and the CSC-I instruction given to the jury. Both the juror error and the instructional error had virtually no prejudicial effect under the circumstances. Therefore, all that is left to cumulate is the potential error associated with the prosecutor's question. As already explained, the jury was instructed to disregard the question and any subsequent discussion. Cumulating the effects of these

errors, accounting for the curative instruction that was given, simply does not rise to the level of being "seriously prejudicial." Therefore, defendant has not established any plain error with regard to the cumulation of errors, and defendant's claim fails.

## VII. SENTENCING

Defendant argues that his constitutional rights were violated when the trial court imposed a 25-year minimum sentence for his CSC-I conviction under MCL 750.520b(2)(b). We conclude that defendant is not entitled to any relief. This Court reviews preserved constitutional issues de novo. *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006).

At issue is MCL 750.520b(2)(b), which provides that when a defendant commits CSC-I and the defendant was at least 17 years old and the victim was less than 13 years age, the defendant is to be sentenced to a term of "imprisonment for life or any term of years, but not less than 25 years." Defendant does not take issue with the statute itself, but argues that because there was no reference to this provision in the amended information, it violates his constitutional rights to be sentenced under that provision.

We decline to address the underlying merits of this issue. That is because the trial court, in addition to relying on MCL 750.520b(2)(b), stated that regardless of what that provision requires, it would have sentenced defendant to the same 25-year minimum sentence as an out-of-guidelines sentence. On appeal, defendant does not challenge this independent ground for imposing defendant's sentence.[19] "When an appellant fails to address the basis of a trial court's decision, this Court need not even consider granting relief." *Seifeddine v Jaber*, 327 Mich App 514, 522; 934 NW2d 64 (2019). In other words, assuming defendant prevailed in his constitutional argument that the trial court could not rely on the mandatory nature of MCL 750.520b(2)(b), such an outcome would have no effect on the other, independent ground for imposing defendant's sentence.

## VIII. CONCLUSION

There were no errors warranting relief. We affirm.

---

[19] Although defendant refers in his brief on appeal to the trial court's decision to independently impose this sentence, he does not directly challenge the legality of imposing such an out-of-guidelines sentence. Instead, he references this "extraordinary departure" as a reason to have resentencing before a different judge. Importantly, his statement of the question presented does not refer to the trial court's decision to sentence defendant on this other basis, and he cites no authority suggesting that the trial court erred by imposing this out-of-guidelines sentence. Accordingly, to the extent defendant's cursory reference to the trial court's "extraordinary departure" could be construed as raising the argument, that argument is abandoned. See *People v Ackerman*, 257 Mich App 434, 450; 669 NW2d 818 (2003) ("[T]he failure to cite any supporting legal authority constitutes abandonment of an issue."); *People v McMiller*, 202 Mich App 82, 83 n 1; 507 NW2d 812 (1993) (stating that an issue is abandoned when it is not raised in the statement of the questions presented).

/s/ Michael J. Riordan
/s/ Stephen L. Borrello
/s/ Mark T. Boonstra